**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ERICA N. HAWTHORNE,

           *Plaintiff*,

   v.

RUSHMORE LOAN MANAGEMENT
SERVICES, LLC,

           *Defendant*.

Civil Action No. 20-393 (RDM)

---

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Erica Hawthorne, the record owner and borrower for a property in the District of Columbia, brings claims for breach of contract, negligence, negligent misrepresentation, intentional infliction of emotional distress, defamation, and violations of the D.C. Consumer Protection Procedures Act, the Fair Credit Reports Act, and the Fair Debt Collection Practices Act against the entity that serviced her mortgage, Defendant Rushmore Loan Management Services, LLC ("Rushmore"). Rushmore timely removed this action from D.C. Superior Court and has now moved to dismiss all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 7. For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part Rushmore's motion.

## I. BACKGROUND

### A.    Factual Background

For purposes of resolving Rushmore's motion to dismiss, the Court must consider the complaint as a whole, accepting the factual allegations therein as true, and may also consider materials attached to or incorporated by reference into the complaint. *See Tellabs, Inc. v. Makor*

*Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).  The doctrines of incorporation by reference and attachment have their limits, however.  For one, documents typically are incorporated into the pleadings only if they are "central to" the pleadings, *Slovinec v. Georgetown Univ.*, 268 F. Supp. 3d 55, 59 (D.D.C. 2017) (quoting *Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 217–18 (D.D.C. 2012)), or if they are "extensively referenced and relied upon" in the pleadings, 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1327 (4th ed. 2021).  Moreover, if a party contests the authenticity of documents referenced in or attached to the complaint, *see Slovinec*, 268 F. Supp. 3d at 59, consideration of these records may convert the motion to dismiss into a motion for summary judgment, *see* Fed. R. Civ. P. 12(d); *cf. Banneker Ventures, LLC*, 798 F.3d at 1133 (noting that "[a] district court may consider a document that a complaint specifically references [and that is integral to the complaint] without converting the motion into one for summary judgment").  Here, Plaintiff's complaint references and relies upon certain loan records, and neither party disputes the accuracy or authenticity of any of those records, or argues that consideration of those records requires conversion of the pending motion into a motion for summary judgment, *see* Fed. R. Civ. P. 12(d).  The Court will, accordingly, rely on these unopposed materials for purposes of resolving the pending motion.

Plaintiff, who is now a New Jersey resident, "is the record owner and borrower" of a property located in the District of Columbia, for which she obtained a mortgage loan of $256,267.00 on November 30, 2007, from Real Estate Mortgage Network, Inc.  Dkt. 1-1 at 2–3 (Compl. ¶¶ 2–4); Dkt. 7-2 at 2–8 (Ex. A).  Plaintiff fell behind on her mortgage in 2015 as a result of "out-of-pocket medical expenses and [her] student loan transitioning out of

forbearance." Dkt. 1-1 at 3 (Compl. ¶ 5). The next year, Rushmore, a limited liability company based in Delaware, assumed responsibility for servicing her mortgage loan. *Id.* (Compl. ¶¶ 3, 6).

    1.   *Trial Modification Agreement*

"In or about October 2016," Plaintiff "began the loss mitigation application process" with Rushmore, for which she received an "assigned point of contact"—Shari Jabri-Gingras, an employee of Rushmore. *Id.* (Compl. ¶¶ 7–8). On December 1, 2016, Rushmore notified Plaintiff by email that she was approved for a loan modification, *id.* at 4 (Compl. ¶ 10), and on January 26, 2017, again by email, it informed her that the offer letter had been sent out, *id.* (Compl. ¶ 11). The offer stipulated a trial modification, allowing modified payments between March 2017 and August 2017. *Id.* Plaintiff accepted and returned the offer letter shortly after she received it. *Id.*; Dkt. 7-4 at 2–6 (Ex. C).

Despite her participation in the trial modification, Plaintiff began to receive notices of foreclosure. The first such notice that Rushmore's foreclosure counsel sent to Plaintiff was dated March 9, 2017. Dkt. 1-1 at 4 (Compl. ¶ 12). Plaintiff contacted "Rushmore to express her concern" and stated that "she felt like she was 'going to have a heart attack'" because of the stress of possible foreclosure. *Id.* (Compl. ¶ 13). When Plaintiff contacted Rushmore's foreclosure counsel on March 23, 2017, "to notify them that she was on an active trial modification," counsel explained "that Rushmore was delayed in communicating that information to them and that [counsel] would ask the court to continue the [foreclosure] case[,] since [Plaintiff] was in good standing with the modification." *Id.* (Compl. ¶ 14). Rushmore's foreclosure counsel further confirmed that Rushmore "would not ask the court to foreclose and that once a permanent modification was received, the case would be dismissed." *Id.* On July 17, 2017, Rushmore informed Plaintiff that her application for final modification had been submitted

3

for review (a process that generally takes 3–4 weeks) and that "once [the documents] were returned, it would take" another four weeks"for the system changes" to take effect, after which Plaintiff could make payments online.  *Id.* at 5 (Compl. ¶ 16).

During this same period, Plaintiff learned that Rushmore was reporting on her loan to credit agencies in a way that negatively affected her credit score.  Plaintiff contacted Rushmore on May 16, 2017, "to inquire about" this "negative credit reporting," but it is unclear if she received any response.  *Id.* (Compl. ¶ 15).  Then, on September 17, 2017, Plaintiff informed Rushmore "that she [had] received an email from TransUnion indicating that the tradeline"—that is, the record of activity for a credit account—"for her loan was reported as having been foreclosed and that her payment due for September 2017 was $20,000.00."  *Id.* (Compl. ¶ 17).  Two days later, Plaintiff contacted Rushmore in response to correspondence she had received from the company "stating that [she] was in default and should pursue a modification."  *Id.* (Compl. ¶ 18).  Plaintiff told Rushmore that she "was confused and caught off guard" by this notice.  *Id.*  Around the same time, Plaintiff received a mailing indicating that she qualified for a loan modification.  *Id.* (Compl. ¶ 19).  Shortly thereafter, on October 2, 2017, Jabri-Gingras notified Plaintiff that her new point of contact with Rushmore would be Fred Taggert, who would contact her.  *Id.* (Compl. ¶¶ 19–20).

Taggert did not contact Plaintiff in the next few days, so on October 5, 2017, Plaintiff asked Jabri-Gingras for Taggert's direct number or to provide Taggert with Plaintiff's contact information.  *Id.* at 6 (Compl. ¶ 22).  Plaintiff explained to Jabri-Gingras that she had questions about documents related to her final modification, which she had to return to Rushmore by October 18, 2017.  *Id.*  Between October 11, 2017 and October 23, 2017, Plaintiff attempted to contact Taggert repeatedly "by phone and email to no avail."  *Id.* (Compl. ¶ 23).  She informed

Rushmore "that she was incredibly frustrated" about this lack of contact and about Rushmore's failure to deliver paperwork that she was supposed to have received two weeks earlier. *Id.* "Specifically, [Plaintiff] informed . . . Rushmore that no one seemed to know what her modified monthly payment would be and that she wanted to get a specific number so that the modification could be finalized." *Id.* (Compl. ¶ 24). She also noted that Rushmore had demanded different payment amounts "in different pieces of correspondence," had reported her credit line as "foreclosed," and had told her to "ignore the foreclosure reporting and court notices." *Id.* (Compl. ¶¶ 25–26).

Taggert eventually contacted Plaintiff on October 23, 2017, to inform her that Rushmore was redrafting her final modification document "but that the processors could not give him a time table for completion." *Id.* at 6–7 (Compl. ¶ 27). In the meantime, he told Plaintiff "that she could continue to make the trial payment of $2,290.00 until" the final modification was completed. *Id.* at 7 (Compl. ¶ 27).

2. *Final Modification Agreement*

Plaintiff eventually received the final modification agreement on October 31, 2017. *Id.* (Compl. ¶ 28). That document set forth an agreement between Plaintiff, as the "Borrower," and the "Owner, by and through Rushmore . . . as current servicer and agent . . . ('Lender')." Dkt. 7-5 at 5 (Ex. D).[1] Among other things, the final modification agreement provided that Plaintiff's new principal balance was $299,060.28; that $9,260.28 of this amount would be "deferred;" and that her "[m]onthly payments of principal and interest" would be $1,421.48. *Id.* at 5–6 (Ex. D).

---

[1] Although this agreement is attached to Plaintiff's complaint, Dkt. 1-1 at 25–27 (Ex. 1), the Court refers to the more legible copy attached to Rushmore's motion to dismiss, *see McGary v. Ravindra*, No. 19-3249, 2020 WL 4335613, at *1 n.1 (D.D.C. July 28, 2020).

In addition, a letter from Rushmore that accompanied the modification agreement specified "that there [was] a shortage of funds in [Plaintiff's] escrow account in the amount of $1,891.70," which was amortized over a five year period and included in Plaintiff's "estimated escrow" payment of $977.36 per month, leading to a total, estimated monthly payment amount of $2,398.84." Dkt. 7-5 at 2-3 (Ex. D).[2]   Rushmore further explained in the accompanying letter that, if Plaintiff's "taxes, insurance premiums[,] and/or assessment amounts change[d]," her monthly escrow payment would also change. *Id.* at 2 (Ex. D).  Finally, the modification agreement specified that "[a]ll covenants, agreements, stipulations, and conditions in the [original note and security instrument] shall be and remain in full force and effect, except as" modified by the agreement, "and [that] none of [Plaintiff's] obligations or liabilities under the [original note and security instrument] shall be diminished or released." *Id.* at 6–7 (Ex. D).

In Plaintiff's view, the final modification agreement introduced a couple of key changes to Plaintiff's loan.  First, "a mandatory escrow account was created as part of the modification" agreement, although Plaintiff's "property taxes and hazard insurance premiums were not originally escrowed into the loan payment." Dkt. 1-1 at 7 (Compl. ¶ 29).  Second, "the documents showed a higher payment amount" per month than what Plaintiff had been paying under the trial modification agreement, and it was unclear whether she was required to make up the difference in payment amounts for the period after the trial modification agreement expired

---

[2]  Although Plaintiff attaches the final modification agreement to her complaint, she does not attach the offer letter that accompanied it.  She does, however, rely on the offer letter in her complaint. Dkt. 1-1 at 7 (Compl. ¶ 28) (noting that "Rushmore forwarded the final modification agreement to" her on October 31, 2017, with terms including an escrow shortage of $1,891.70). Because Plaintiff's negligence claim is premised, in part, on the allegation that the escrow requirement was improperly added to her loan, *see* Dkt. 1-1 at 13 (Compl. ¶¶ 67–68), and because she alleges that the escrow account was added in the final modification agreement, the Court will treat the October 31, 2017, letter as incorporated by reference in the complaint, *see Banneker Ventures, LLC*, 798 F.3d at 1133.

and the final modification agreement took effect.  *Id.* (Compl. ¶ 30).  Because the letter accompanying the final modification agreement asserted that the higher payment amount took effect on September 1, 2017, Dkt. 7-5 at 2 (Ex. D), Plaintiff asked Taggert if she needed to "send the payment difference for September and October," Dkt. 1-1 at 7 (Compl. ¶ 30).  Plaintiff again sought clarification from Taggert on this point on November 15, 2017, *id.* (Compl. ¶ 31), and again on November 30, 2017, *id.* at 8 (Compl. ¶ 32).  Finally, On December 6, 2017, Taggert informed Plaintiff that "he [had] calculated the difference in the September, October and November payments as . . . $326.52."  *Id.* (Compl. ¶ 33).  Then, on December 21, 2017, "Rushmore forwarded to [Plaintiff] a copy of the final modification agreement reflecting signatures from both her and . . . Rushmore."  *Id.* (Compl. ¶ 34).  Plaintiff alleges that "[s]ince her loan was modified in October 2017, Rushmore has continued to change the amount that [Plaintiff] is required to pay on a monthly basis" and that "she has overpaid her monthly mortgage payment amount but has not received a credit or payment adjustment."  *Id.* at 9 (Compl. ¶ 41).

It is unclear whether Plaintiff ever paid the $326.52 differential for the months of September, October, and November 2017, but by early 2018, she evidently believed she was up to date on her payments.  On January 8, 2018 and again on January 30, 2018, Plaintiff informed Taggert "that her credit report was still showing that she was late on payments," and she asked that he correct the discrepancy or direct her "to the person [who] handles the corrections."  *Id.* at 8 (Compl. ¶ 35).  On February 2, 2018, Taggert contacted Plaintiff and advised her "to make the request for credit correction in writing[,] as his request had been rejected," and he provided Plaintiff with the relevant "contact information for the appropriate Rushmore department."  *Id.* (Compl. ¶ 36).

On February 9, 2018, Plaintiff spoke with "a representative [who] stated that she was four

. . . months in arrears." *Id.* (Compl. ¶ 37).  Shortly thereafter, Plaintiff left a message for

Taggert, and on February 20, 2018, she "contacted . . . Taggert again and asked if she could get a

response." *Id.* (Compl. ¶ 38).  Plaintiff told Taggert "that she was afraid to send money [to

Rushmore] because [Taggert] had no idea where the money went." *Id.* at 8–9 (Compl. ¶ 38).  A

few weeks later, on March 13, 2018, Plaintiff again contacted Taggert to inquire "why she had

not yet received a . . . resolution to her online payment authorization or negative reporting." *Id.*

at 9 (Compl. ¶ 39).

In July 2018, Rushmore informed Plaintiff "that she was overpaying and that she only

owed $340 for her August 2018 payment," but the company also continued to advise Plaintiff

that she was in default. *Id.* (Compl. ¶¶ 42–43).  Her "credit report" also reflected that she was in

default. *Id.* (Compl. ¶ 43).  On September 14, 2018, Plaintiff again contacted Taggert to alert

him to a "notice of missed payment" she had received from TransUnion. *Id.*  (Compl. ¶ 40).

Evidently, her "loan balance was still showing as $303,000.00[,] which didn't match what

Rushmore's interface said" and did not reflect the $50,000.00 she had paid to Rushmore. *Id.*

Plaintiff alleges that Rushmore "failed to apply mortgage payments made [from] March 2017

through January 2019 [to her mortgage] until February 2019." *Id.* (Compl. ¶ 44).  At some point,

Plaintiff contacted the credit reporting agencies to dispute Rushmore's reporting, but Rushmore

confirmed its reporting as accurate, and "[t]he credit reporting agencies subsequently closed the

disputes." *Id.* at 9–10 (Compl. ¶ 45).

    3.    *Other Actions by Rushmore and Harm to Plaintiff*

Beginning in 2018, Rushmore began making additional charges to Plaintiff's account

without consulting her.  At some point in 2018, Plaintiff learned that Rushmore had added a

force-placed insurance policy to her account "without providing her the required notice pursuant to 12 C.F.R. § 1024.37," even though she already had "an active private policy" in place.  *Id.* at 10 (Compl. ¶ 46).  For a time, the "insurance issue [was] corrected," but Rushmore later, once again, "added a force-placed policy to [Plaintiff's] account."  *Id.*  In addition, in 2019, Plaintiff "noticed that a company was performing landscaping services for her property [even though] she already employed a company to maintain her lawn" and that Rushmore was "unnecessarily charging fees for services."  *Id.* (Compl. ¶ 47).

On October 24, 2019, Rushmore informed Plaintiff that it had made a "business decision to retract her escrow analysis review completed on October 17, 2019" and to return Plaintiff's "loan back to its original state prior to the analysis."  *Id.* (Compl. ¶ 48) (alteration omitted).  But Rushmore also stated that it would reanalyze her account on a date to be determined and that she would receive notice of her new payment "after it was determined."  *Id.*  "The attached escrow analysis disclosure statement note[d] a surplus of $10,388.73."  *Id.*

Plaintiff alleges that she has suffered various injuries due to Rushmore's alleged mismanagement.  She contends that Rushmore's "false negative reporting" compromised her credit score, blocking her from securing a $10,000 loan and from obtaining car leases.  *Id.* (Compl. ¶¶ 49–50); that she "was unable to rent her property" because she was "denied financing for . . . needed repairs," thereby losing "$24,000.00 in annual rental income;" *id.* at 11 (Compl. ¶ 51); that she "suffer[s] from Crohn's Disease" and because of the stress of her "interaction [with] and treatment by . . . Rushmore," she was placed on additional medications, which forced her "to discontinue her invitro fertilization treatments;" *id.* (Compl. ¶ 52); and that "[s]he continues to experience panic attacks, headaches[,] and weight loss all due to stress," *id.*

**B.      Procedural Background**

Plaintiff initiated this action in the Superior Court for the District of Columbia on January

9, 2020, Dkt. 1 at 1.  Her complaint includes eight counts: breach of contract (Count I), Dkt. 1-1

at 11–12 (Compl. ¶¶ 54–60); negligence (Count II), *id.* at 12–14 (Compl. ¶¶ 61–71); negligent

misrepresentation (Count III), *id.* at 14–16 (Compl. ¶¶ 72–78); violation of the District of

Columbia Consumer Protection Practices Act ("CPPA") (Count IV), *id.* at 16–18 (Compl. ¶¶ 79–

87); violation of the Fair Credit Reporting Act ("FCRA") (Count V), *id.* at 18–19 (Compl. ¶¶ 88–

93); violation of the Fair Debt Collection Practices Act ("FDCPA") (Count VI), *id.* at 19–21

(Compl. ¶¶ 94–102); infliction of emotional distress (Count VII), *id.* at 21 (Compl. ¶¶ 103–09);

and defamation (Count VIII), *id.* at 22–23 (Compl. ¶¶ 110–14).  On February 10, 2020,

Rushmore timely removed the action to this Court, invoking the Court's federal question

jurisdiction, 28 U.S.C. § 1331, and diversity jurisdiction, *id.* §§ 1332**,** 1441, 1446; Dkt. 1 at 1.

After removing the action, Rushmore moved to dismiss for failure to state a claim, Dkt.

7, and that motion is now before the Court.

## II.  LEGAL STANDARD

In resolving a motion to dismiss for failure to state a claim, the Court "must . . . 'tak[e]

note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine

whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to

relief that is plausible on its face.'"  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir.

2015) (alterations in original) (internal citation omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

675, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the [C]ourt to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

556 (2007)).  The Court need not, however, "accept inferences" that "are unsupported by the

facts set out in the complaint[,] [n]or must the [C]ourt accept legal conclusions cast in the form

of factual allegations."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Thus, a movant may prevail on a 12(b)(6) motion only by "demonstrating that the facts alleged

in the complaint, and accepted as true for purposes of resolving the motion, do not warrant

relief."  *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 173 (D.D.C. 2016) (citing

*Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997)).

## III.  ANALYSIS

The Court will consider each of Plaintiff's eight claims in turn.[3]

### A.      Breach of Contract

Plaintiff first asserts a claim for breach of contract.  According to Plaintiff, Rushmore

"had a duty to service [her] loan in a manner that was in compliance with the [n]ote and [d]eed

. . . and [the] modification" agreement, Dkt. 1-1 at 11 (Compl. ¶ 55), but "breached that duty

when it [1] failed to properly calculate [Plaintiff's] final monthly payment" in the final

modification agreement; "[2] continued to change the monthly payments after the final

modification agreement was executed in November 2017;" and "[3] added an escrow account

without a written agreement or notice to [Plaintiff]," *id.* at 11–12 (Compl. ¶¶ 56–58).  She

contends that, due to these breaches, "she was forced to pay incorrect monthly payment amounts

[and] penalty fees and [was] reported as late to the credit reporting agencies."  *Id.* at 12 (Compl.

¶ 60).

---

[3]   Both parties invoke D.C. law in addressing Plaintiff's common law claims, and, in the absence
of any argument to the contrary, the Court will treat the question of choice of law as conceded.

Rushmore, for its part, maintains that it never entered into a contract with Plaintiff. Rather, according to Rushmore, "[t]he owner of the Loan, the party who is owed money on the Loan, and the party who is secured by the Deed of Trust is U.S. Bank, not Rushmore," Dkt. 7-1 at 12, and Rushmore is merely the loan servicer, *id*. And, similarly, the parties to the modification agreement are the "Owner" of the loan—that is, U.S. Bank—and the "Borrower"— that is, Plaintiff. *Id.*; *see also* Dkt. 7-5 at 5 (Ex. D). Finally, Rushmore argues that, even if it were a party to one of the agreements at issue, Plaintiff's complaint fails to "identify a specific contractual provision allegedly breached" and, therefore, fails to state a claim. Dkt. 7-1 at 13.

"To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Robinson v. Deutsche Bank Nat'l Tr. Co.*, 932 F. Supp. 2d 95, 109 (D.D.C. 2013) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). Of principal relevance here, "[w]ithout a contractual duty, there can be no breach of contract." *Edmond v. Am. Educ. Servs.*, No. 10-578, 2010 WL 4269129, at *2 (D.D.C. Oct. 28, 2010) (quoting *Ihebereme v. Capital One, N.A.*, No. 10-1106, 2010 WL 3118815, at *3 (D.D.C. Aug. 9, 2010)). "Judges around the country—including [in this district]—have held that a loan servicer, as a lender's agent, has no contractual relationship or privity with the borrower and therefore cannot be sued for breach of contract." *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 28 (D.D.C. 2014); *see also Robinson*, 932 F. Supp. 2d at 109 (no contractual relationship for a loan servicer); *Edmond*, 2010 WL 4269129, at *2 (same); *cf. Rittenberg v. Donohoe Constr. Co. Inc.*, 426 A.2d 338, 340–41 (D.C. 1981) (rent-collecting agent lacked a contractual relationship with tenants).

"[W]here agents . . . make contracts on behalf of their principals, they can be held liable only in very limited circumstances." *Guttenberg v. Emery*, 41 F. Supp. 3d 61, 69 (D.D.C. 2014). This rule "is consistent with the bargain principle in contemporary contract law under which 'the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and consideration.'" Restatement (Third) of Agency § 6.01 cmt. b (Am. L. Inst. (2006) (quoting Restatement (Second) of Contracts § 17(1) (Am. L. Inst. 1981)). An agent acting with apparent authority who manifests assent to an exchange "*on behalf of* a disclosed principal does not become a party to the contract and is not subject to liability as a guarantor of the principal's performance unless the agent and the third party so agree." *Id.* (emphasis added).

There are at least two ways in which an agent may incur liability for a breach of the contract. First, an agent may incur liability "if [it] binds [itself] by definite words and stipulations," making clear that it is a party to the contract. *Walford v. McNeill*, 100 F.2d 112, 115 (D.C. Cir. 1938); *see also Guttenberg*, 41 F. Supp. 3d at 69 (citing Restatement (Third) of Agency § 6.01). By contrast, "[a]n agent is not a party to a contract if any portion of the parties' writing makes clear that the agent acts solely in a representative capacity," and "[s]uch an indication may . . . include statements of . . . the principal's name followed by the agent's name preceded by a preposition such as 'by' or 'per.'" Restatement (Third) of Agency § 6.01 cmt. b(1). Second, an agent may incur personal liability if it "enters into a contract without disclosing [its] principal." *Resnick v. Abner B. Cohen Advert.*, 104 A.2d 254, 255 (D.C. 1954); *see also Guttenberg*, 41 F. Supp. 3d at 69 (referencing situations with undisclosed or unidentified principals). This liability extends to so-called "unidentified principals," where the third party knows that the agent is acting on behalf of a principal but does not know the identity of that principal. Restatement (Third) of Agency § 6.02. Under those circumstances, the third party is

13

"unable to assess the principal's reputation, assets, or other indicia of creditworthiness and ability to perform duties under the contract," and thus, unless the parties "agree otherwise," the agent is bound by the agreement. *Id.* cmt. b.

"A third party has notice of a principal's identity when, regardless of the source, the third party has notice of facts reasonably sufficient to identify the principal." *Id.* cmt. d. Significantly, whether the third party is reasonably on notice of the principal's identity is a question of fact. *Id.* The third party, moreover, "does not have a burden of inquiry." *Id.* § 6.01 cmt. c. Rather, "[a] third party will be treated as having notice of an agency relationship if the third party has actual knowledge of it or reason to know of it or if the third party has been given a notification of it." *Id.*; *see also id.* § 6.02 cmt. d. The "third party may have notice that [the] agent acts as an agent for an unidentified principal from writings executed by the agent, among other sources." *Id.* cmt. d.

With these general principles of agency law in mind, the Court concludes that Plaintiff's claim to enforce the original note or deed of trust against Rushmore fails as a matter of law. The deed of trust expressly identifies Real Estate Mortgage Network, Inc., as the lender, Dkt. 7-2 at 2 (Ex. A), and, in any event, Plaintiff's complaint acknowledges that the mortgage was initiated in 2007, years before Rushmore "mortgage servicing for the loan was transferred to . . . Rushmore" in 2016. Dkt. 1-1 at 3 (Compl. ¶¶ 4, 6). Plaintiff offers no reason to depart from settled precedent holding that loan servicers, such as Rushmore, do not assume a contractual relationship with the borrower merely because they service the loan. *See Edwards*, 24 F. Supp. 3d at 28. Accordingly, Plaintiff cannot sue Rushmore for breach of the original note or deed of trust.

The final modification agreement presents a different—and closer—question.  As Rushmore stresses, it signed the final modification agreement only as the agent for the owner of the loan.  The agreement stipulates that it is "between [Plaintiff] ('Borrower') and Owner, by and through Rushmore . . . as current servicer and agent . . . ('Lender')."  Dkt. 7-5 at 5 (Ex. D); Dkt. 7-1 at 12.  In Rushmore's view, this ends the inquiry, and "any breaches of the [agreement] must be asserted against the [owner]."  Dkt. 7-1 at 12.  As explained above, however, the question whether an agent is bound by a contract executed on behalf of an unidentified principal is not so simple.

Unsurprisingly, the parties take very different views about whether the unidentified-principal doctrine applies here.  Plaintiff maintains that Rushmore "failed to disclose the [owner's] identity" in the agreement, thereby exposing it to liability as an agent for an unidentified principal, Dkt. 9-1 at 8, while Rushmore maintains that "the identity of the owner of the [l]oan, *e.g.*, the principal, was disclosed[,] as prior to the execution of the Modification Agreement there was a complete chain of assignments of the [deed], recorded with the Recorder of Deeds," Dkt. 11 at 3.  Rushmore is, of course, correct that a third party's knowledge of a principal's identity at the time of the agreement can relieve the agent of liability.  The problem with its argument, however, is that the Court cannot decide, on the bare pleadings, whether Plaintiff was on "notice of facts reasonably sufficient to identify the principal," Restatement (Third) of Agency § 6.02 cmt. d.

That question is one of fact, and nothing in Plaintiff's complaint or in the documents incorporated into it by reference provides a dispositive answer.  Plaintiff, for her part, says nothing about the identity of the owner of the note in her complaint, nor do any of documents that she attaches to her complaint.  And, although Rushmore attaches to its motion to dismiss an

assignment of the deed of trust, dated May 27, 2016, which identifies the assignee as U.S. Bank

National Association in its capacity as Trustee for the Maroon Plains Trust ("U.S. Bank"), Dkt.

7-3 at 10, nothing in the pleadings provides answers to a number of essential questions, including

whether Plaintiff was on notice of facts reasonably sufficient to have identified U.S. Bank as the

owner at the time Rushmore executed the modification agreement; whether and when the

assignment was sent to her; and whether any intervening assignment might have taken place.

To be sure, Rushmore may be able to prove at a subsequent stage of the proceeding that

Plaintiff was on notice of facts sufficient to identify Rushmore's principal.  But that proof, if it

exists, lies beyond the four corners of Plaintiff's complaint (and the incorporated documents),

and, accordingly, is not properly before the Court at this preliminary stage of the litigation.  *See*

*Twombly*, 550 U.S. at 556; *Olenga v. Gacki*, 507 F. Supp. 3d 260, 272 (D.D.C. 2020).

Accordingly, at least for present purposes, the Court cannot accept Rushmore's contention that it

is not a party to the modification agreement.

Beyond this point, however, Plaintiff's breach of contract claim loses steam.  According

to Plaintiff, Rushmore had a contractual obligation to service her "loan in a manner that was in

compliance with the Notice and Deed of Trust and modification," Dkt. 1-1 at 11 (Compl. ¶ 55),

and that it breached that undertaking in three respects.  First, Plaintiff alleges that Rushmore

breached its obligation "when it failed to properly calculate [her] final monthly payment when it

issued the final modification agreement in October 2017."  *Id.* (Compl. ¶ 56).  What Plaintiff

means by this is not obvious.  But it is clear that Rushmore could not possibly have breached the

modification agreement—the only agreement to which it is even arguably a party—"when it

issued [that] agreement."  *Id.*  And, in any event, it is clear that this allegation is too vague and

conclusory to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678; *Powel v. Ben's Chili Bowl*, No. 20-0436, 2021 WL 2949168, at *2 (D.D.C. July 14, 2021).

Second, Plaintiff alleges that Rushmore breached the modification agreement "when it continued to change the monthly payments" she was required to remit "after the final modification agreement was executed in November 2017."  Dkt. 1-1 at 11 (Compl. ¶ 57).  Again, this allegation is too vague and conclusory to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  Most notably, Plaintiff fails to identify how—and to what extent—her payment amount changed.  The final modification agreement did obligate Plaintiff to pay a fixed monthly amount of $1,421.48 for principal and interest, Dkt. 7-5 at 6 (Ex. D), but it set no fixed amount for the escrow portion of the monthly payment, *see id.* at 5–11 (Ex. D), and Plaintiff does not allege that Rushmore varied the amount due for principal and interest.  Absent more, the claim fails as a matter of law.

Finally, Plaintiff alleges that Rushmore breached the final modification agreement "when it added an escrow account without a written agreement or notice to" Plaintiff.  Dkt. 1-1 at 12 (Compl. ¶ 58).  But, once again, she fails to identify the contractual undertaking that Rushmore purportedly breached.  The documents that are before the Court and that are incorporated in the complaint, moreover, controvert Plaintiff's contention.  To start, the letter that accompanied the final modification agreement explained that Plaintiff's "total payment" would include "an estimated escrow portion of $977.36;" that her "escrow payment amount [would] adjust if [her] taxes, insurance premiums and/or assessments change;" and that "this means that [her] monthly payment may change."[4]  Dkt. 7-5 at 2 (Ex. D).  The final modification agreement, in turn,

---

[4] The offer letter could arguably be cast as parol evidence to the final loan modification agreement rather than a document setting forth contractually binding terms, but neither party pursues this argument; instead, both parties refer to the offer letter as part-and-parcel with the

required Plaintiff to "comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, *escrow items*, impounds, and all other payments that Borrower is obligated to make under the Security Instrument."  *Id.* at 6 (emphasis added).  The Deed of Trust, in turn, required the Borrower to "include in each monthly payment, together with the principal and interest . . . , a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments . . . on the Property, and (c) premiums for insurance" to cover hazards, casualties, and contingencies.  Dkt. 7-2 at 3; *see also id*. at 4 (defining required insurance).  The Court, accordingly, is unable to identify the contractual provision that Plaintiff alleges Rushmore breached by adding "an escrow account without a written agreement or notice to" Plaintiff.  Dkt. 1-1 at 12 (Compl. ¶ 58).

Plaintiff has therefore failed to plead facts sufficient to put Rushmore and the Court on notice of what contractual provision or provisions she alleges Rushmore breached.  *See Armstrong v. Navient Sols., LLC*, 292 F. Supp. 3d 464, 472–73 (D.D.C. 2018) (holding that the plaintiff had failed to allege a breach of contract against a creditor because the plaintiff identified no contractual provision protecting the plaintiff from misstated account balances or the loss of time and convenience associated with disputing an inaccurate balance).

The Court will, accordingly, dismiss her breach of contract claim without prejudice.

---

agreement.  *See* Dkt. 1-1 at 7 (Compl. ¶¶ 28–29) (referring to the escrow amount stipulated in offer letter as a "term[]" of the agreement); Dkt. 7-1 at 14 (responding to the challenge of breach of contract by referring to a disclaimer in the offer letter).  Following the parties' lead, the Court treats the offer letter as part of the final modification agreement.

B.    **Negligence**

Plaintiff also asserts a negligence claim against Rushmore.  She alleges that Rushmore breached a "duty to service the loan in a manner that was in compliance with the loan documents, final modification agreement[,] and applicable state and federal statutes," Dkt. 1-1 at 12–13 (Compl. ¶ 62), when it (1) "failed to properly calculate [her] final monthly payment for the final modification" agreement, (2) "continued to change the final monthly payment after the final modification agreement was executed," (3) "assessed late fees and inspection costs to her loan despite not being in default," (4) "improperly added force[-]placed insurance to the loan," (5) "failed to properly notify [Plaintiff] in writing that an escrow account would be added to the loan," (6) "improperly re-analyzed [her] escrow account," and (7) "reported to the credit reporting agencies that she was delinquent after the final modification agreement . . . despite her . . . timely payments." *Id.* at 13 (Compl. ¶¶ 63–69).  As a result, Plaintiff alleges, she "was forced to pay incorrect monthly payment amounts [and] penalty fees and [was] reported as late to the credit reporting agencies." *Id.* (Compl. ¶ 71).

To the extent the duties that Rushmore allegedly breached turn on Rushmore's alleged failure to service the loan "in compliance with the loan documents," Dkt. 1-1 at 12 (Compl. ¶ 62), Plaintiff's negligence claim fails as a matter of law.  To state a negligence claim, a plaintiff must allege facts sufficient to show "(1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach." *Findlay v. CitiMortgage, Inc.*, 813 F. Supp. 2d 108, 120 (D.D.C. 2011) (quoting *District of Columbia v. Fowler*, 497 A.2d 456, 463 n.13 (D.C. 1985)).  Of particular importance here, however, the duty at issue "must exist in its own right independent of [any] contract, and any duty upon which the tort is based

must flow from considerations other than [a] contractual relationship." *Carter v. Bank of Am., N.A.*, 888 F. Supp. 2d 1, 15 (D.D.C. 2012) (quoting *Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46, 53–54 (D.D.C. 2010)).  That is, "[t]he tort must stand as a tort even if the contractual relationship did not exist." *Id.* (quoting *Nugent*, 752 F. Supp. 2d at 54).  Because Plaintiff grounds her negligence claims, at least in large part, on the premise that Rushmore owed her various duties arising from the modification agreement and other contractual documents, she fails to satisfy this requirement.  *See Armstrong*, 292 F. Supp. 3d at 473–74 (rejecting a negligence claim because the plaintiff "failed to identify any authority recognizing a lender or servicer's non-contractual duty" to correctly report account balances); *Carter*, 888 F. Supp. 2d at 15 (rejecting a gross negligence claim because the plaintiff failed to allege a non-contractual duty owed by the bank managing her mortgage); *KBI Transp. Servs. v. Med. Transp. Mgmt., Inc.*, 679 F. Supp. 2d 104, 108–09 (D.D.C. 2010) (rejecting a negligence claim because the plaintiff failed to identify a non-contractual duty).

Recognizing this difficulty, Plaintiff attempts to identify other sources of Rushmore's asserted duty of care.  She asserts without explanation, for example, that Rushmore "breached its duty pursuant to the Real Estate Settlement Procedures Act ("RESPA") and, in particular 24 C.F.R. 3500.17, when it improperly re-analyzed [her] escrow account."  Dkt. 1-1 at 13 (Compl. ¶ 68).  That regulation, which was issued by the Department of Housing and Urban Development ("HUD"), was rescinded in 2014, after the underlying regulatory authority was transferred to the newly formed Consumer Financial Protection Bureau ("CFPB"), and the CFPB issued its own regulation governing the same subject matter.  See Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34,224, 34,226 (June 16, 2014) (listing 24

CFR Part 3500 as removed).[5]  Because the CFPB regulation mirrored the HUD regulation in relevant respects, Plaintiff's miscitation is inconsequential.  But, putting that misstep aside, Plaintiff's invocation of the regulation does nothing to advance her claim because neither her complaint nor her opposition brief identifies any particular provision of RESPA or the implementing regulation that gives rise to a duty of care that Rushmore purportedly breached. As a result, Plaintiff's allegations regarding the RESPA regulation are too vague and conclusory to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.

Beyond that, it is difficult to read Plaintiff's opposition brief without concluding that she essentially concedes that her negligence claim fails as a matter of law.  Her argument consists— *in its entirety*—of the following:

> The Defendant owed [Plaintiff] a duty of care pursuant to the Fair Credit Reporting Act, the Fair Debt Collection Practices Act[,] and the Consumer Protection Procedure Act as argued herein.  As alleged in her Complaint, and in the argument below, the Defendant's conduct suffices as a tort separate from any contractual claim.

Dkt. 9-1 at 10.  It is not the Court's role to develop a theory of recovery on Plaintiff's behalf, and Plaintiff fails to explain how these federal and D.C. statutory mandates are incorporated into the common law of torts.  Plaintiff says nothing, for example, about the FCRA's preemption provision, which expressly preempts any requirement imposed under the laws of any state involving a "subject matter regulated under" 15 U.S.C. § 1681s-2 "relating to the responsibilities

---

[5] 24 C.F.R. § 3500.17 was originally promulgated by HUD pursuant to its authority to implement RESPA.  The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, later transferred HUD's authority over RESPA to the CFPB, prompting the removal of 24 C.F.R. pt. 3500 from the Code of Federal Regulations.  *See* 79 Fed. Reg. at 34,225.  The CFPB issued new regulations implementing RESPA at 12 C.F.R. pt. 1024, including 12 C.F.R. § 1024.17, which, except for a few provisions, is a near-identical copy of 24 C.F.R. § 3500.17.  The removal of 24 C.F.R. § 3500.17 and the promulgation of 12 C.F.R. § 1024.17 occurred in 2014 and 2011 respectively, and so predated Plaintiff's complaint and the violations alleged therein.

of persons who furnish information to consumer reporting agencies." 15 U.S.C.

§ 1681t(b)(1)(F); *see also Himmelstein v. Comcast of the Dist., LLC*, 931 F. Supp. 2d 48, 60

(D.D.C. 2013); *Armstrong*, 292 F. Supp. 3d at 471.  More generally, without additional

explanation from Plaintiff, the Court cannot discern which provisions of the statutes that Plaintiff

references give rise to a non-preempted duty under D.C. common law or a cause of action that

does not merely replicate (and repeat) the asserted statutory claims.

The Court will, accordingly, dismiss Plaintiff's negligence claims without prejudice.

## C.    Negligent Misrepresentation

Plaintiff's claim for negligent misrepresentation fails as well, although for different

reasons.  Plaintiff alleges that Rushmore "negligently communicated false information to"

Plaintiff (1) "when it continued to inform her that her loan was modified while simultaneously

sending default correspondence, reporting the account as being in default, and referring the file

to outside counsel," Dkt. 1-1 at 14 (Compl. ¶ 73); (2) "when it continued to change her monthly

payment amounts," *id.* (Compl. ¶ 74); and (3) "when it advised her to ignore the negative

reporting and foreclosure notices," *id.* at 15 (Compl. ¶ 75).  Rushmore responds that Plaintiff's

negligent misrepresentation claim should be dismissed because her complaint fails to identify a

specific misrepresentation and "is completely silent [with respect to] any action she took to her

detriment in reliance on the alleged misrepresentation." Dkt. 7-1 at 17–18. [6]

"A plaintiff alleging negligent misrepresentations or omissions must show (1) that the

defendant made a false statement or omitted a fact that [it] had a duty to disclose; (2) that it

---

[6] Rushmore also argues that the negligent misrepresentation claim is "preempted by the FCRA as
[it] relate[s] to Rushmore's alleged incorrect reporting on its tradeline to the consumer reporting
agencies." Dkt. 11 at 6.  Although the Court agrees that the FCRA preempts this portion of
Plaintiff's negligent misrepresentation claim, the claim goes beyond the alleged misreporting to
credit agencies, so the Court must consider Rushmore's other arguments.

involved a material issue; and (3) that the plaintiff reasonably relied upon the false statement or omission to [her] detriment." *Heyer v. Schwartz & Assocs. PLLC*, 319 F. Supp. 3d 299, 306–07 (D.D.C. 2018) (alteration omitted) (quoting *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015)).  "The elements of a claim of negligent misrepresentation are similar" to a fraud claim, "except that they do not include the *scienter* requirements" of knowledge of falsity and intent to deceive that apply in a fraud case.  *Parr v. Ebrahimian*, 774 F. Supp. 2d 234, 240 (D.D.C. 2011).  But, as with a fraud claim, Federal Rule of Civil Procedure 9(b)'s requirement that a plaintiff "state with particularity the circumstances constituting" the misrepresentation apply.  Fed. R. Civ. P. 9(b); *see Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of U.S.*, 258 F. Supp. 3d 1, 20 (D.D.C. 2017); *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 206 (D.D.C. 2016); *In re U.S. Off. Prods. Co. Secs. Litig.*, 251 F. Supp. 2d 58, 74 n.9 (D.D.C. 2003).

Before continuing, it is worth pausing to address a point of ambiguity in the complaint. Plaintiff makes repeated references to Rushmore falsely representing that Plaintiff was in default, but it is unclear if she is referring to default as to her obligations pursuant to the deed of trust and original note or default as to payments due pursuant to the trial and/or final modification agreements.  *See, e.g.*, Dkt. 1-1 at 8 (Compl. ¶ 35) (referring to Plaintiff's credit report showing "that she was late on payments"); *id.* at 14 (Compl. ¶ 73) (accusing Rushmore of falsely reporting that she was in default); *id.* at 17 (Compl. ¶¶ 84–85) (alleging that Rushmore engaged in unfair and deceptive trade practices by representing to Plaintiff both that her loan was modified and reporting that she was in default).  The distinction matters because, as far as the Court can discern, it is uncontested that Plaintiff was in default under the deed and original note (hence the need for a loan modification).

The loan modification agreements that Plaintiff relies on in her complaint make clear that she was in default with respect to her payments pursuant to the original loan documents. *See* Dkt. 7-4 at 2–3 (Ex. C) (noting more than once that "Borrower[]" is "in default"). Furthermore, the modification agreements dispel any illusion that entrance into or compliance with the modification agreements would change her status with respect to default. *See id.* at 5 (Ex. C) ("[N]othing in this [a]greement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the [l]oan [d]ocuments."); Dkt. 7-5 at 7 (Ex. D) ("Nothing in this [a]greement shall be understood or construed to be a satisfaction or release in whole or in part of the [n]ote and [deed]."). Rather, the loan modifications guaranteed that foreclosure would not proceed, notwithstanding Plaintiff's default. *See id.* ("The parties agree that the consideration for this [a]greement is Lender's forbearance from presently exercising its rights and pursuing its remedies under the [deed] as a result of Borrower's default thereunder.").

Rushmore reads Plaintiff's complaint to allege that Rushmore reported Plaintiff's default as to payments due under the deed and original note, and it contends that such reporting was accurate, and "[w]ithout a misrepresentation, there can be no fraud claim." Dkt. 7-1 at 18. But Plaintiff's claims are also amenable to a different reading: Rushmore was reporting Plaintiff as defaulting on payments pursuant to the loan modification agreements. Several factual allegations in the complaint and incorporated documents support this interpretation. First, the trial modification agreement refers to "default" in the context of failing to make the modified payments, so the term is not reserved to failure to make payments pursuant to the deed and original note. *See* Dkt. 7-4 at 3 (Ex. C). Second, Plaintiff alleges that she requested that Taggert correct Rushmore's credit report and that Taggert, in fact, tried to make such a correction; if Plaintiff was concerned merely because her credit report showed (correctly) that she was in

default as to payments due under the deed and original note, it is difficult to understand why Taggert would have tried to correct the reporting.  Dkt. 1-1 at 8 (Compl. ¶ 36).  Finally, Plaintiff's opposition to Rushmore's motion to dismiss suggests that her allegations pertain to inaccurate reporting of default on her modified payments, because she contends that the alleged default is logically inconsistent with her overpaying the modified payment amounts.  *See* Dkt. 9-1 at 15 ("It defies reason that [Plaintiff] could have—in the same month—made overpayments and also be in default.").  For present purposes, the Court need not decide which of these two readings of the complaint is what Plaintiff intended; the lack of clarity is itself problematic in light of Plaintiff's heightened pleading obligations under Rule 9(b).  *See, e.g.*, *Pencheg Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 91–92 (D.D.C. 2014) (holding that a claim lacked specificity under Rule 9(b) because it was "not at all clear" which of two possible scenarios formed the basis for the claim); *see also United States ex rel. Joseph v. Canon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (identifying one of the purposes of the specificity requirement as "guarantee[ing] [the] defendant[] sufficient information to allow for preparation of a response" since "'fraud' encompasses a wide variety of activities").

But even putting this difficulty aside, Plaintiff's complaint fails to allege a necessary element of a fraud claim: that Plaintiff took "any action . . . to her detriment in reliance on the alleged misrepresentation."  Dkt. 7-1 at 18.  Plaintiff does not address this contention in her opposition, *see* Dkt. 9 at 10–11, and "[i]t is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain *arguments* raised by defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Davis v. Transp. Sec. Admin.*, 264 F. Supp. 3d 6, 10 (D.D.C. 2017) (alteration in original) (quotation marks and citations omitted).  Indeed, rather than respond to Rushmore's argument,

25

Plaintiff merely lists harms that she allegedly suffered based on the Rushmore's actions.  Dkt. 9-1 at 10–11.  Falsity and harm, however, are not enough to allege a claim for negligent misrepresentation, and neither Plaintiff's complaint nor her opposition brief even hints at any action that she took in reasonable reliance on the asserted false statements.

The Court will, accordingly, dismiss Plaintiff's claim for negligent misrepresentation without prejudice.

### D.      D.C. Consumer Protection Procedures Act

Plaintiff also claims that Rushmore violated the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, which "is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 722–23 (D.C. 2003) (quoting *Atwater v. D.C. Dep't of Consumer & Reg. Affs.*, 566 A.2d 462, 465 (D.C. 1989)).  In particular, she alleges that Rushmore violated Section 28-3904, a provision forbidding unfair trade practices and making it "unlawful for a 'person,' among other things, to 'misrepresent . . . a material fact which has a tendency to mislead' or to 'fail to state a material fact if such failure tends to mislead.'" *Glycobiosciences, Inc. v. Innocutis Holdings, LLC*, 189 F. Supp. 3d 61, 71 (D.D.C. 2016) (quoting D.C. Code § 28-3904).  Rushmore contends that this claim fails as a matter of law because the CPPA applies only to unlawful trade practices arising out of a consumer–merchant relationship, and, according to Rushmore, Plaintiff is not a consumer and Rushmore is not a merchant.  Dkt. 7-1 at 19–21.  Because the Court agrees with Rushmore that Plaintiff is not, for present purpose, a consumer, it need not reach Rushmore's alternative argument.

The D.C. Court of Appeals "has repeatedly concluded that the CPPA was designed to police trade practices arising only out of consumer–merchant relationships."  *Archie v. U.S.*

*Bank, N.A.*, Nos. 18-CV-945 & 19-CV-155, 2021 WL 3412500, at *8 (D.C. 2021) (quotation

marks and citation omitted).  Real estate mortgage financing transactions, moreover, may—at

least at times—fall within the coverage of the CPAA because they involve sales of consumer

credit.  *See DeBerry v. First Gov't Mortg. & Invs. Corp.*, 743 A.2d 699, 701, 703 (D.C. 1999).

That principle applies equally to real estate refinancing.  *Id.*; *see also Archie*, 2021 WL 3412500

at *8.  So far, so good.

The problem with Plaintiff's CPPA claim is that the complaint is devoid of any allegation

that she was a "consumer" in any of her dealings with Rushmore.  In *Shaw v. Marriott*

*International*, the D.C. Circuit concluded that, for purposes of the CPPA, a "consumer" is "a

person who receives or demands goods or services that are primarily for personal, household, or

family use."  605 F.3d 1039, 1043 (D.C. Cir. 2010) (citing D.C. Code § 28-3901(a)(2), (6)).

According to Rushmore, the latter part of this definition—"personal, household, or family

use"—spells trouble for Plaintiff.  For one, Plaintiff alleges that "[h]er place of residence" is

Newark, New Jersey, not the District of Columbia, where the property in this case is located.

Dkt 1-1 at 1 (Comp. ¶ 2).  In addition, and perhaps most significantly, the principal injury that

Plaintiff alleges with respect to the property itself is not the loss of a place to live but rather the

loss of rental—that is, business—income.  *Id.* at 11 (Compl. ¶ 51).

Judge Hogan of this Court faced a similarly situated plaintiff in *Yudzon v. Sage Title*

*Group*, No. 18-2076, 2020 WL 2615579 (D.D.C. May 22, 2020).  In that case, the plaintiff

purchased a condominium unit located in the District, and he subsequently sued the settlement

and escrow agent, alleging that the company had failed to conduct a reasonable investigation into

whether the D.C. Tenant Opportunity to Purchase Act requirements for affidavits had been met.

*Id.* at *1–3.  At the time of the purchase, the plaintiff lived in New York, and he "purchased the

unit as an investment and with the possibility of residing there himself in the future." *Id*. at *1. Unfortunately for the plaintiff, these two facts doomed his claim as a matter of law.  As Judge Hogan explained, the plaintiff did not qualify as a "consumer" for purposes of the CPPA because "the CPPA does not protect businesses engaged in commercial activity," including those engaged in renting their residential property.  *Id.* at *5 (quotation marks and citation omitted).

The *Yudzon* decision coheres with a long line of precedent from the D.C. Court of Appeals, the D.C. Circuit, and this Court.  *See*, *e.g*., *Stone v. Landis Constr. Co.*, 120 A.3d 1287, 1290 (D.C. 2015); *Shaw*, 605 F.3d at 1043; *Ford v. ChartOne, Inc*., 908 A.2d 72, 81 (D.C. 2006); *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 26-27 (D.D.C. 2014).  And, here, just as in *Yudzon*, nothing in the complaint suggests that Plaintiff engaged in any transaction with Rushmore to acquire goods or services "primarily" for her "personal, household, or family use."  Plaintiff does not allege that she resided at the "subject property" at any time after Rushmore started to service the loan or after Rushmore executed the modification agreements on behalf of the lender, and she at least suggests that she held the property principally for investment purposes.

Plaintiff does not dispute any of this in her opposition brief, and, indeed, she concedes that she moved to New Jersey in 2011, Dkt. 9-1 at 13 n.3, long before Rushmore entered the equation.  Instead, she argues that she is nonetheless a "consumer" for purposes of the CPPA because she originally purchased the property as her primary residence.  *Id.* at 13.  That contention, however, is inconsistent with the approach to the CPPA that the D.C. Circuit recently took in *Baylor v. Mitchell Rubenstein & Associates*, 857 F.3d 939 (D.C. Cir. 2017).  Although that case focused on whether the defendant was a "merchant" within the meaning of the CPPA, it made clear that courts must assess whether the required consumer–merchant relationship existed

at the time the defendant engaged in the alleged misconduct.  In that case, the plaintiff argued

that the defendant—a law firm that was acting as a debt collector but that had not been involved

in the initial transaction—was "connected to the supply side of the [consumer] transaction in

which [the plaintiff] first acquired her student loans."  *Id.* at 948.  The D.C. Circuit was

unpersuaded, holding that it was "implausible to characterize [the defendant] as someone who

sold or transferred consumer goods or services or who supplied the goods or services which are

or would be the subject matter of a trade practice."  *Id.*  The court, in short, declined to ignore the

events that intervened between the plaintiff's acquisition of the loan as a consumer, and the

defendant's efforts to collect the ensuing debt, which the original lender had transferred to a new

creditor.  *Id.*

      The same approach applies here.  As in *Baylor*, there is little doubt that Plaintiff engaged

in a covered, consumer transaction when she originally borrowed funds to purchase her personal

residence.  *Id.* at 948.  But by the time Rushmore became the loan servicer and executed the

modification agreements on behalf of U.S. Bank, which itself did not acquire the debt until May

2016, Dkt. 7-3 at 10, Plaintiff no longer resided at the property and, apparently, held the property

for investment purposes.  Because the CPPA applies only to "consumers"—that is, those who

receive or demand goods or services "primarily for personal, household, or family use," *Shaw*,

605 F.3d at 1043, her claim fails as a matter law.

      Finally, Plaintiff requests leave to amend her complaint to "plead that her loan was

incurred primarily for personal, family or household purposes."  Dkt. 9-1 at 13.  To the extent

she seeks leave merely to allege that she resided in the property at the time she borrowed the

funds from the original creditor, for the reasons explained above, such an amendment would

prove futile.  But, to the extent she can allege facts that would support a claim that her

transactions with Rushmore were for "personal, family or household purposes," the Court will grant Plaintiff leave to amend.

The Court will, accordingly, dismiss Plaintiff's CPPA claim without prejudice.

### E.     Fair Credit Reporting Act

Plaintiff further alleges that Rushmore violated the FCRA, 15 U.S.C. §§ 1681 *et seq.*, "when it started and continued to report that [Plaintiff] was . . . late and/or in default on her monthly mortgage payments after the final modification was approved," Dkt. 1-1 at 18 (Compl. ¶ 90), and "after she disputed the reporting [to] Rushmore and . . . the respective reporting agencies," *id.* (Comp. ¶ 91).  "The FCRA was enacted 'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" *Himmelstein*, 931 F. Supp. 2d at 52 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)).  "To state a claim [against a furnisher of credit information], [a plaintiff] must allege that: (1) she notified a [credit reporting agency] of a dispute related to her credit information; (2) the [credit reporting agency] then notified the furnisher of the information about the dispute; and (3) the furnisher failed to fulfill the obligations enumerated in [the FRCRA]." *Mushala v. US Bank, Nat'l Ass'n*, No. 18-1680, 2019 WL 1429523, at *9 (D.D.C. Mar. 29, 2019); *see also Himmelstein*, 931 F. Supp. 2d at 52–53 (explaining the source of a private cause of action against information furnishers).

Rushmore argues that Plaintiff's FCRA claim fails because it is time-barred and factually deficient.  Dkt. 7-1 at 21–23.[7]  As to the first argument, Rushmore avers that "because [Plaintiff] does not allege when she notified the [credit reporting agencies], it is impossible to determine if

---

[7] Rushmore also contends that debts incurred for business purposes are not covered by the FCRA, but Plaintiff clarifies in her opposition that she incurred the mortgage to reside in the property, and Rushmore seems to have abandoned this argument in its reply.  *See* Dkt. 11 at 9–10.

the FCRA claim is timely." *Id.* at 22.  "The running of the statute of limitations," however, "is

an affirmative defense, Fed. R. Civ. P. 8(c), and thus a plaintiff is not required to plead

timeliness in her complaint." *Fowler v. District of Columbia*, No. 18-634, 2020 WL 7014205, at

*6 (D.D.C. Nov. 27, 2020).  Because Rushmore fails to identify any allegation in Plaintiff's

complaint that supports its statute of limitations defense, the defense fails at this early stage of

the proceeding. *See Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam)

("[D]ismissal is appropriate only if the complaint on its face is conclusively time-barred.").

     As to Plaintiff's second argument, Rushmore argues that Plaintiff does not "specify how

exactly Rushmore violated the FCRA" and does "not allege that Rushmore failed to conduct a

reasonable investigation into Plaintiff's dispute and/or failed to report any inaccuracies or

omissions to the" credit reporting agencies.  Dkt. 7-1 at 22-23.  In its reply, Rushmore further

clarifies its argument:

> In [her] Opposition, Plaintiff argues [that] it is unreasonable to advise Plaintiff
> that she overpaid in July 2018, while also reporting the Loan in default.  It
> appears that Plaintiff is arguing that[,] as a result[,] Rushmore failed to conduct
> a reasonable investigation into Plaintiff's dispute and/or failed to report any
> inaccuracies or omissions to the [credit reporting agencies].  However, Plaintiff
> could have overpaid for a single month but still be[en] delinquent on the Loan.
> Therefore, as pleaded, Plaintiff has not stated a violation of the FRCA.

Dkt. 11 at 10.

     Although Plaintiff's complaint is not the picture of clarity, Rushmore reads the complaint

to allege that it failed to conduct a reasonable investigation, as required by the FCRA, and the

Court concurs with that reading of the complaint.  As explained above, moreover, the complaint

can be reasonably construed to allege that Rushmore inaccurately reported the payments that

Plaintiff made pursuant to the modification agreements.  For example, Plaintiff alleges (or at

least appears to allege) that she informed Rushmore in September 2018 that she had received a

"notice of missed payment . . . from [credit reporting agency] TransUnion" and that her "loan balance" did not reflect the full amount she had paid to Rushmore, according to the company's own "interface."  Dkt. 1-1 at 9 (Compl. ¶ 40).  She also alleges that "Rushmore failed to apply mortgage payments made March 2017 through January 2019 until February 2019," *id.* (Compl. ¶ 44); that she "contacted the credit reporting agencies to dispute the negative reporting by . . . Rushmore," *id.* (Compl. ¶ 45); but that "Rushmore confirmed" the negative reporting, *id.*  Those allegations, even if turbid, are sufficient to state a claim under the FCRA.  The theoretical possibility that "Plaintiff could have overpaid for a single month but still be[en] delinquent," Dkt. 11 at 10, does not render Plaintiff's claim implausible "on its face," *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted); *see also Haynes v. Navy Fed. Credit Union*, 825 F. Supp. 2d 285, 294–96 (D.D.C. 2011) (holding that an FCRA claim was sufficiently pleaded by a plaintiff who alleged an information furnisher had incorrectly reported his payments to credit agencies and that the furnisher had confirmed the disputed report).

The Court will, accordingly, deny Rushmore's motion to dismiss Plaintiff's FCRA claim.

## F.     Fair Debt Collection Practices Act

Plaintiff further alleges that Rushmore violated another provision of 15 U.S.C. § 1692e, which prohibits the "use of any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e(10).  The statute defines "debt" as "any obligation . . . to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  *Id.* § 1692a(5); *see also Edwards*, 24 F. Supp. 3d at 26.

Rushmore first argues that this claim is time-barred because "[t]he majority of the alleged unlawful debt collection activities appear to have occurred more than one year prior to the filing

of the [c]omplaint," and because "FDCPA claims are subject to a one-year statute of limitations from the date the violation allegedly occurred." Dkt. 7-1 at 24 (citing 15 U.S.C. § 1692k(d); and *Mazza v. Verizon Wash. DC, Inc.*, 852 F. Supp. 2d 28, 36 (D.D.C. 2012)). And, several courts have held that "new violations" of the FDCPA will not "resurrect prior, untimely claims based on a 'continuing violation' theory." *Gajewski v. Ocwen Loan Servicing*, 650 F. App'x 283, 286 (7th Cir. 2016); *see also Michaels v. NCO Fin. Sys., Inc.*, No. 16-1339, 2020 WL 2800664, at *5 (D.D.C. May 29, 2020); *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 144 (D.D.C. 2018). Rushmore's contention fails, however, on its own terms. Even if Rushmore is correct that a "majority" of the allegedly unlawful debt collection occurred outside the statute of limitations, and even if the continuing violation theory does not apply in this context, Rushmore seemingly acknowledges—as it must—that Plaintiff alleges that *some* of the alleged misconduct occurred within the statute of limitations.

Rushmore further argues that the FDCPA does not apply "because Plaintiff did not allege that she obtained the Loan primarily for personal, family or household purposes." Dkt. 7-1 at 24. The deed of trust, which Rushmore attaches to its motion and argues that the Court should consider, however, includes an "occupancy" covenant, pursuant to which Plaintiff represented that she would use the property as her "principal residence within sixty days after execution of the [deed] and shall continue to occupy the [p]roperty as [her] principal residence for at least one year after the date of occupancy." Dkt. 7-2 at 4. As a result, the complaint is reasonably construed to allege that Plaintiff obtained the loan for personal purposes. Because Rushmore merely argues that the FDCPA applies to debts "*incurred* 'primarily for personal, family or household purposes,'" Dkt. 7-1 at 24 n.6 (emphasis added), that disposes of the issue. Rushmore does not allege that the loan, once incurred, must be *maintained* primarily for personal purposes.

Finally, in its reply brief, Rushmore argues that Plaintiff's FDCPA claim fails because she does not allege that the supposed misconduct involved "communications" to Plaintiff.  Dkt. 11 at 11.  In a footnote, Rushmore explains:

> "Determining whether a communication constitutes an attempt to collect a debt is a commonsense inquiry that evaluates the 'nature of the parties' relationship,['] the objective purpose and context of the communication, and whether the communication includes a demand for payment."  *Garner v. ClaimAssist, LLC*, Civ. Action No. ELH-16-1260, 2017 U.S. Dist. LEXIS 42007, at *31-31 (D. Md. Mar. 22, 2017) (citation omitted).  Here, [it] is unclear whether any of the alleged violative conduct was a communication, let alone one in furtherance of [the] collection of a debt.

*Id.* at 11 n.5.  However, because this argument was raised for the first time in a reply, and because Plaintiff has had no opportunity to respond it, the Court will not consider it.  *See Lucas v. District of Columbia*, 214 F. Supp. 3d 7, 10 (D.D.C. 2016); *Latson v. Holder*, 82 F. Supp. 3d 377, 388 n.4 (D.D.C. 2015); *see also Rollins v. Envt'l Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").

The Court will, accordingly, deny Rushmore's motion to dismiss Plaintiff's FDCPA claim.

## G.   Intentional Infliction of Emotional Distress Claim

Plaintiff also attempts to assert a claim for intentional infliction of emotional distress. Dkt. 1-1 at 21 (Compl. ¶¶ 103–09); *see also* Dkt. 9-1 at 16–17.  According to Rushmore, that claim fails because Plaintiff does not allege "that she suffered emotional distress as a result of [Defendant's] 'extreme and outrageous conduct.'"  *Edwards*, 24 F. Supp. 3d at 32 (quoting *Khan v. Parsons Glob. Servs., Ltd.*, 521 F.3d 421, 428 (D.C. Cir. 2008)); *see also* Dkt. 7-1 at 25–26. Under D.C. law, the tort of intentional infliction of emotional distress requires "conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"

*Homan v. Goyal*, 711 A.2d 812, 818 (D.C.) (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n.

10 (D.C.1994)), *amended by* 720 A.2d 1152 (D.C. 1998); *see also* Restatement (Second) of Torts

§ 46 cmt. h (Am. L. Inst. 1965).  Determining whether the plaintiff's allegations meet this

standard is, at least in the first instance, a question for the Court.  *Homan*, 711 A.2d at 818; *see*

*also Busby v. Capital One, N.A*., 932 F. Supp. 2d 114, 148 (D.D.C. 2013).

     Here, nothing contained in the complaint comes close to clearing this high hurdle.

Although Plaintiff alleges that she suffered greatly due to Rushmore's alleged misconduct, her

emotional distress is not enough to state a claim.  Rather, a claim for intentional infliction of

emotional distress requires outrageous misconduct, "beyond all possible bounds of decency,"

which is "intolerable in a civilized community."  *Homan*, 711 A.2d at 818.  Even accepting

Plaintiff's allegations as true, Rushmore's careless implementation of the modification

agreements and missteps in serving her loan do not plausibly rise to the level of "extreme and

outrageous conduct."  *Khan*, 521 F.3d at 428.

     The Court will, accordingly, grant Rushmore's motion to dismiss Plaintiff's claim for

intentional infliction of emotional distress without prejudice.

## H.    Defamation

     Finally, Plaintiff claims that Rushmore defamed her by incorrectly reporting to credit

agencies that she was in default and that a foreclosure would ensue.  Dkt. 1-1 at 22 (Compl.

¶ 111).  Rushmore argues that "because the defamation claim is premised solely on conduct[]

regulated by the FCRA, it is preempted and must be dismissed."  Dkt. 7-1 at 27.  Other decisions

in this district have recognized that defamation claims of the sort Plaintiff brings are preempted

by the FCRA.  *See Pleznac v. Equity Residential Mgmt, LLC*, 320 F. Supp. 3d 99, 107 (D.D.C.

2018); *Ihebereme*, 933 F. Supp. 2d at 98.  This preemption does not hinge, as Plaintiff suggests, Dkt. 9-1 at 17, on whether the Plaintiff in fact prevails on an FCRA claim.

The Court will, accordingly, dismiss Plaintiff's defamation claim with prejudice.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Rushmore's motion to dismiss Plaintiff's breach of contract claim (Count I), negligence claim (Count II), negligent misrepresentation claim (Count III), CPPA claim (Count IV), emotional distress claim (Count VII), and defamation claim (Count VIII).  The Court **DENIES** Rushmore's motion to dismiss Plaintiff's FCRA claim (Count V) and FDCPA claim (Count VI).

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 30, 2021