UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERICA N. HAWTHORNE,<br><br>    *Plaintiff*,<br><br>v.<br><br>RUSHMORE LOAN MANAGEMENT SERVICES, LLC,<br><br>    *Defendant*. | Civil Action No. 20-cv-393 (RDM) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On January 9, 2020, Plaintiff Erica Hawthorne, the record owner and borrower for a property in the District of Columbia, brought this action against Defendant Rushmore Loan Management Services, LLC ("Rushmore"), the entity that serviced her mortgage, for actions it took in connection with that mortgage. Still pending before the Court are Hawthorne's claims under the Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDCPA"). *See* Dkt. 14. Rushmore now moves for summary judgment on those claims. *See* Dkt. 32. For the reasons that follow, the Court **DENIES** that motion.

**I. BACKGROUND**

**A.   Factual Background**

The Court recounted Hawthorne's allegations in detail in its opinion granting in part and denying in part Rushmore's motion to dismiss. *See* Dkt. 14. The facts that follow are only those most relevant to the resolution of Rushmore's motion for summary judgment. When considering a motion for summary judgment, a court must "take the facts in the record and all reasonable inferences derived therefrom in a light most favorable to" the nonmoving party. *Coleman v.*

1

*Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)).

Hawthorne, a New Jersey resident, is the record owner of real property located in the District of Columbia, for which she obtained a mortgage loan of $256,267 on November 30, 2007. *See* Dkt. 32-1 at 6 (Def.'s SUMF ¶ 1). In 2016, Rushmore assumed responsibility for servicing Hawthorne's mortgage. *See id.* (Def.'s SUMF ¶ 3); Dkt. 35-1 at 3.

On December 6, 2017, Hawthorne entered into a loan modification agreement with Rushmore. *See* Dkt. 32-1 at 6 (Def.'s SUMF ¶ 4); Dkt. 35-1 at 3. In the months leading up to this agreement, Hawthorne alleges that she participated in a "trial modification" in which she made modified payments on her loan to Rushmore. *See* Dkt. 1-1 at 4 (Compl. ¶ 11). Despite participating in this trial process, Hawthorne claims that she received notices of foreclosure and learned that Rushmore was providing negative reports to credit reporting agencies. *Id.* at 4–5 (Compl. ¶¶ 12, 14, 15, 17, 18). Hawthorne alleges that she contacted Rushmore about these reports and asked other questions about her trial modification to no avail as "no one seemed to know what her modified monthly payment would be." *Id.* at 6 (Compl. ¶¶ 23–24).

The final loan modification agreement specified that Hawthorne's new principal balance was $299,060.28. *See* Dkt. 7-5 at 5. Of that, $9,260.28 would be "deferred," and her "monthly payments of principal and interest" would be $1,421.48. *Id.* at 5–6. A letter accompanying the agreement also stated that "[d]ue to the timing of [Hawthorne's] tax and insurance payments," Rushmore had determined that "there [was] a shortage of funds in [Hawthorne's] escrow account in the amount of $1,891.70," which she was required to pay over five years. *Id.* at 3. When that amount was added to her regular escrow payment, her total estimated monthly escrow payment came to $977.36. *Id.* at 2.

2

The execution of the final loan modification agreement, however, did not resolve the confusion Hawthorne had as to what she owed Rushmore. She alleges that in the two years that followed she was informed by Rushmore many times that "she was overpaying" and that "she was in default." Dkt. 1-1 at 9 (Compl. ¶¶ 42–43). Her credit reports reflected that latter view, stating that Hawthorne was past due on her payments as to this loan and that "foreclosure [had been] initiated." *See, e.g.*, Dkt. 35-6 at 7. She alleges that she reported to both Rushmore and the credit reporting agency that she believed the reports' representation of her debt was inaccurate, but neither entity took any remedial action. *See* Dkt. 1-1 at 9–10 (Compl. ¶ 45).

Hawthorne also alleges that, during this period, Rushmore provided her "false information . . . regarding her monthly mortgage payment every month." *Id.* at 20 (Compl. ¶¶ 98–99). And, she alleges that in 2019, Rushmore began "unnecessarily charging fees for services" that were improperly rendered. *Id.* at 10 (Compl. ¶ 47). On October 24, 2019, Rushmore informed Hawthorne that it had decided to "retract [her] escrow analysis review" for her loan and that it would inform her of her new payment obligations at a date "to be determined." *Id.* at 10 (Compl. ¶ 48); Dkt. 32-10 at 2.

Hawthorne alleges that, as a consequence of Rushmore's wrongful actions, she has repeatedly applied for mortgages and lines of credit, but those applications have been denied. *See* Dkt. 32-5 at 12 (Interrog. 8). She also alleges that Rushmore's misconduct has caused her substantial stress, which has exacerbated her Crohn's Disease symptoms and has caused her to endure panic attacks, headaches, and weight loss. Dkt. 1-1 at 11 (Compl. ¶ 52); Dkt. 32-5 at 7–11 (Interrog. 6).

B.     **Procedural History**

On January 9, 2020, Hawthorne initiated this action in the Superior Court for the District of Columbia. Dkt. 1 at 1 (Notice of Removal ¶ 1). Rushmore removed the case to this Court on February 10, 2020. *Id*. at 6. Hawthorne's complaint originally included eight claims brought under state and federal law. *Id.* at 5 (Notice of Removal ¶ 19). Rushmore moved to dismiss the complaint, *see* Dkt. 7, and the Court granted in part and denied in part that motion, *see* Dkt. 14. Now, only Hawthorne's federal law claims remain: Count V alleges that Rushmore violated the FCRA, Dkt. 1-1 at 18–19 (Compl. ¶¶ 88–93), and Count VI alleges Rushmore violated the FDCPA, *id.* at 19–21 (Compl. ¶¶ 94–102).

After the Court ruled on Rushmore's motion to dismiss, the case proceeded to discovery, which concluded on August 5, 2022. Min. Order (July 14, 2022). On several occasions while discovery was underway, Hawthorne expressed an interest in filing an amended (or, more accurately, a supplemental) complaint, seeking to add new claims stemming from actions Rushmore had taken after the initial action was filed. *See* Dkt. 33 at 2–3. She did not, however, seek leave to amend (or to supplement) her complaint until one month after discovery had closed and two weeks before Rushmore's motion for summary judgment was due. *Id.* at 3. In that motion, Hawthorne sought to add new factual allegations in support of her existing claims and to add two new counts for violations of regulations implementing the Real Estate Settlement Procedures Act. *See* Dkt. 30. After finding that granting such a motion would unfairly prejudice Rushmore, and that Hawthorne had been dilatory in seeking leave to amend, the Court denied Hawthorne's motion for leave to file an amended complaint on October 10, 2022. *See* Dkt. 33 at 9.

Rushmore moved for summary judgment on September 30, 2022.  *See* Dkt. 32.  Hawthorne opposed the motion on October 24, 2022, *see* Dkt. 35, and Rushmore replied on November 18, 2022, *see* Dkt. 37.

## II. LEGAL STANDARD

Summary judgment is warranted if a movant can "show[] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it could "affect the outcome of the [litigation] under [] governing law," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence "in the light most favorable to the nonmoving party" and "must draw all reasonable inferences" in that party's favor.  *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a "reasonable jury" to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In ruling on a motion for summary judgment, "the court shall grant summary judgment only if . . . the moving part[y] is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  *See Muslim Advocs. v. U.S. Dep't of Just.*, 833 F. Supp. 2d 92, 98 (D.D.C. 2011).

## III.  ANALYSIS

A.  **Fair Credit Reporting Act Claim**

The FCRA was enacted in 1970 to "promote 'fair and accurate credit reporting' and to protect consumer privacy." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) (quoting 15 U.S.C. § 1681(a)).  "To achieve this end, the Act regulates the creation and the use of 'consumer report[s]' by 'consumer reporting agenc[ies]'" ("CRAs").  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (quoting 15 U.S.C. §§ 1681a(d)(1), 1681b(a)).  In addition to imposing duties on the CRAs themselves, the Act also imposes certain responsibilities on the "furnishers" of information to CRAs.  *Himmelstein v. Comcast of the Dist., LLC*, 931 F. Supp. 2d 48, 2 (D.D.C. 2013).  Common furnishers include credit card issuers, lenders, utilities, insurers, auto dealers, and collection agencies.  *Id.*  Neither party disputes that Rushmore is a furnisher under the FCRA.  *See* Dkt. 32-1; Dkt. 35-1.

The FCRA imposes two sets of duties on furnishers.  The first set, established by 15 U.S.C. § 1681s-2(a), provides that "[a] person shall not furnish any information relating to a consumer to any [CRA] if the person knows or has reasonable cause to believe that the information is inaccurate," *id.* § 1681s-2(a)(1)(A).  If a furnisher provides information to a CRA that it "determines is not complete or accurate," the furnisher is required to "promptly notify the [CRA] of that determination" so that the CRA has information that is "complete and accurate." *Id.* § 1681s-2(a)(2).  Finally, "[i]f the completeness or accuracy of any information furnished . . . to [a CRA] is disputed . . . by a consumer, the person may not furnish the information to any [CRA] without notice that such information is disputed by the consumer." *Id.* § 1681s-2(a)(3).  This first set of duties imposed by § 1681s-2(a) does not provide a private right of action and thus cannot be enforced by an individual.  *See Ihebereme v. Cap. One, N.A.*, 933 F. Supp. 2d 86,

Case 1:20-cv-00393-RDM Document 38 Filed 09/29/23 Page 7 of 20

110–11 (D.D.C. 2013), *aff'd,* 573 F. App'x 2 (D.C. Cir. 2014); *Himmelstein*, 931 F. Supp. 2d at 52–53; *Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28, 34 (D.D.C. 2012).

The second set of duties imposed by the FRCA does, however, provide such a private right of action, and it is this set of duties that Hawthorne invokes in support of her claim. *Himmelstein*, 931 F. Supp. 2d at 52–53; *Mazza*, 852 F. Supp. 2d at 34. These duties, established by 15 U.S.C. § 1681s-2(b), are triggered when a consumer contests the accuracy of a credit report to a CRA. *Himmelstein*, 931 F. Supp. 2d at 52. "[I]f the completeness or accuracy of any item of information contained in a consumer's file at a [CRA] is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute," the CRA is obligated to investigate and notify the furnisher of the dispute. 15 U.S.C. § 1681i(a)(1)(A), (a)2(A). Once notified, a furnisher must "conduct an investigation with respect to the disputed information;" "review all relevant information provided by the consumer reporting agency;" "report the results of the investigation to the [CRA];" and correct their records for purposes of future reports to the CRAs. *Id.* § 1681s-2(b)(1).

In Count V of the complaint, Hawthorne alleges that Rushmore violated § 1681s-2(b)(1) "when it continued to report that [she] was late and/or in default on her monthly mortgage statements after she disputed the reporting with . . . Rushmore and with the respective credit reporting agencies." Dkt. 1-1 at 18 (Compl. ¶ 91). She alleges, in particular, that she was not late or in default on her mortgage; that she notified Rushmore and the CRA of that fact in 2018; and that, as a result, Rushmore should have corrected that mistake and the default should not have appeared on her credit reports thereafter. *See* Dkt. 35-1 at 7–8. Because that information continued to appear on credit reports, Hawthorne contends that one of two things must be true: either Rushmore did not comply with its obligations under FCRA to conduct an adequate

7

investigation with respect to the disputed information, or it did not report the results of that investigation to the CRA. *Id.* at 8. Either way, Hawthorne maintains, Rushmore has violated the FCRA. *Id.*

Rushmore moves for summary judgment on this claim. *See* Dkt. 32. It argues that Hawthorne's FCRA claim cannot succeed because (1) she has not demonstrated that she disputed her credit report to the CRA prior to 2022, which is necessary for her to prove that Rushmore violated its obligations under that Act, and (2) she has not demonstrated that she suffered any harm as a result of Rushmore's alleged violations. *Id.*

1.   *Evidence that Hawthorne disputed the accuracy of her credit report*

Rushmore first contends that it is entitled to summary judgment on Count V because there is no evidence that Hawthorne "submitted credit disputes to the CRAs between the years of 2017 and 2021." *See* Dkt. 32-1 at 11. Although Rushmore acknowledges that its own records indicate that Hawthorne reported a dispute to the CRA, which it received notice of in April 2022, *see id.* (citing Dkt. 32-8 at 2 (Younger Decl. ¶ 6)), Rushmore contends that there is no evidence that Hawthorne reported a dispute to a CRA before then, *see id.* Because a necessary element of Hawthorne's FCRA claim is proof that she "reported [the alleged] inaccuracy to a[] credit reporting agency pursuant to section 1681i(a)(1)," *Ihebereme*, 933 F. Supp. 2d at 111, Rushmore maintains that Hawthorne cannot succeed on her claim that it violated the FCRA prior to the 2022 dispute, *see* Dkt. 32-1 at 11–12. Simply put, a furnisher's obligations to investigate a dispute only arise under § 1681s-2(b) *after* the furnisher is notified by a CRA of a dispute.

The difficulty with this argument is that Rushmore's description of the record is incomplete. To be sure, the declaration that Rushmore submitted along with its motion for summary judgment avers that the company "did not receive any other [Automated Consumer

8

Dispute Verifications ("ACDVs")] regarding [Hawthorne] before April 28, 2022." Dkt. 32-8 at 3 (Younger Decl. ¶ 12). But Hawthorne's responses to Rushmore's interrogatories state that she "began disputing the negative [credit reporting] in September 2017," Dkt. 32-5 at 7 (Interrog. 5), and Hawthorne testified at her deposition, in response to a question asking for "evidence . . . that [she] submitted credit reporting disputes to the credit reporting agencies before 2022," that she "kn[ew] that [she] did" dispute her credit reports but did not have copies of the resolved dispute documents, Dkt. 32-4 at 15–16 (Hawthorne Dep. 144:6–8, 145:9). Finally, in response to Rushmore's motion for summary judgment, Hawthorne has provided the Court with a set of records, which she describes as showing "credit disputes, investigation results and credit reports for [] Hawthorne from January 2018 to May 2022." Dkt. 35-1 at 7. These appear to be records from TransUnion (a CRA) indicating that a dispute was pending regarding Hawthorne's file on January 11, 2018, May 17, 2018, October 3, 2019, and February 3, 2022. *See* Dkt. 35-6 at 4, 12, 18, 22. In addition, Hawthorne has proffered a letter addressed to her from TransUnion, dated January 11, 2018, stating that its "investigation of the dispute [she] recently submitted is now complete," *id.* at 5, as well as several documents indicating that her credit report had been disputed and corrections to the Rushmore loan had been made, *id.* at 13, 20. Considered together, these records raise a triable issue of material fact about whether Hawthorne disputed her credit report to a CRA prior to 2022.

Rushmore responds that these "non-dispute communications with Transunion are . . . insufficient to establish a[] FCRA violation." Dkt. 37 at 3. But Rushmore provides no meaningful explanation as to why these records are insufficient. Although these documents may not constitute the formal dispute documents themselves, a reasonable trier of fact could find that they show that Hawthorne did, in fact, lodge a sufficient complaint with a CRA.

9

Rushmore also argues that Hawthorne "admit[ted]" in her brief in opposition "that she submitted her credit disputes to Rushmore and not to the CRAs." *Id.* Although Hawthorne's brief does describe several interactions that she had with Rushmore concerning the information it furnished, she also states that she "contacted the CRA in 2018 to dispute the negative reporting." Dkt. 35-1 at 7–8. Accordingly, the Court is unpersuaded that Hawthorne "admitted" that she failed to submit her dispute to the CRA.

The Court thus concludes that there remains a genuine dispute of material fact as to whether, and when, Hawthorne disputed her credit report to the CRA such that Rushmore's investigatory obligations under the FCRA were triggered.

  2.   *Evidence of damages*

Rushmore also seeks summary judgment on Count V on the ground that Hawthorne "cannot establish any damages" stemming from the alleged violation. Dkt. 37 at 4 (capitalization altered); *see also Renford v. Cap. One Auto Fin.*, No. 21-02382, 2022 WL 1211193, at *5 (D.D.C. Apr. 25, 2022) ("A person who violates the FCRA's requirements 'with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . any actual damages sustained by the consumer as a result of the failure.'" (quoting 15 U.S.C. § 1681*o*(a)(1))), *aff'd*, No. 22-7055, 2022 WL 16557007 (D.C. Cir. Aug. 19, 2022). In support of this argument, Rushmore asserts that the evidence Hawthorne has provided to show that she "was denied credit/loans due to [Rushmore]'s erroneous credit reporting," Dkt. 35-1 at 6 (Pl.'s SUMF ¶ 6)—namely, a letter from Barclays,[1] dated May 26, 2022, informing Hawthorne of its decision to deny her credit because of "[r]ecent delinquency indicated [by the] credit bureau," Dkt. 32-9 at

---

[1] The parties refer to this letter as being sent by JetBlue. *See* Dkt. 37 at 5; Dkt. 35-1 at 4. But the document itself appears to have been sent by Barclays in response to an application from Hawthorne for a "JetBlue Plus Credit Card." Dkt. 32-9 at 2.

2—is insufficient standing alone to survive summary judgment because it does not demonstrate that Barclays' decision was *because of* Rushmore's reporting, Dkt. 32-1 at 12; Dkt. 37 at 4–5; *see also Crabill v. Trans Union, LLC*, 259 F.3d 662, 664 (7th Cir. 2001) ("Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages.'" (citations omitted)).

If this was the only evidence in the record concerning the effect that Rushmore's alleged violations of the FCRA had on Hawthorne's ability successfully to apply for lines of credit, the Court might agree that the letter does not suffice. After all, the letter from Barclays denying Hawthorne's application for the JetBlue credit card was dated May 26, 2022, Dkt. 32-9 at 2, and this suit was filed in January 2020, *see* Dkt. 1. And while Hawthorne sought leave to add to her complaint further allegations concerning FCRA violations that she says occurred in 2022, *see* Dkt. 30-1 at 18–19 (Am. Compl. ¶¶ 96–103), the Court denied that motion, *see* Dkt. 33. As a result, this suit pertains only to the violations Rushmore purportedly committed between 2018 and 2020. To succeed on her FCRA claims, Hawthorne must prove that she incurred actual damages as a result of the alleged FCRA violations prior to 2020. *See Mattiaccio v. DHA Grp., Inc.*, No. 12-1249, 2016 WL 10733978, at *3 (D.D.C. Jan. 6, 2016) ("[A] Plaintiff may recover actual damages for an FCRA violation *only* if those damages were caused by the violation."). The Barclays letter, as a result, is relevant only to the extent it shows that Rushmore's allegedly inaccurate reporting prior to 2020 harmed Hawthorne two years later in 2022. Without more evidence to support such an inference—particularly in light of the lack of temporal proximity of those two events—concluding that the May 2022 credit denial was as result of inaccurate reporting at least two years earlier would, at least, arguably require too great a leap to support a claim for damages.

But, fortunately for Hawthorne, she has provided the additional evidence required to raise the issue above a speculative level. At her deposition, Hawthorne testified that her "credit score, once it started getting bombarded with the late pays in 2017, from Rushmore," was so low that she "wasn't even eligible to apply for a subprime loan." Dkt. 35-4 at 7 (Hawthorne Dep. 40:9–12). She also testified that Rushmore's reporting "dropped [her credit] score enough that [she] couldn't get any kind of credit." *Id.* at 14 (Hawthorne Dep. 104:17–18). Hawthorne acknowledges that she was eventually able to obtain a subprime loan in 2020 after repeatedly disputing Rushmore's negative reporting; but she also says that she had to have someone else "put . . . cash down" to do so and that she was told by the lender that this requirement was "because of [her] mortgage." *Id.* at 16 (Hawthorne Dep. 110:7–10). On Hawthorne's account, her recent struggles to obtain credit can be traced to Rushmore's inaccurate reporting that began in 2017 (and allegedly continues until present), which lowered and continues to dampen her credit score. *See also id.* at 10 (Hawthorne Dep. 59:9–11) (explaining that "the only person who has reported recent delinquent payments is Rushmore" and her "credit cards [we]re all paid off" when she applied to Barclays for the JetBlue credit card).

Hawthorne also attests in her responses to Rushmore's interrogatories that, as a result of Rushmore's alleged negative reporting, she was denied a "Rocket Mortgage," a "Better Mortgage," a "United Airlines Credit Card," and a "Virginia Credit Union Loan." Dkt. 32-5 at 12 (Interrog. 8). The summary judgment record does not contain any letters or other records of these denials. At her deposition, Hawthorne testified that her Better Mortgage and United Airlines Credit Card were denied because of "delinquencies" in her credit report. Dkt. 32-4 at 32 (Hawthorne Dep. 207:4). And, she testified that her Rocket Mortgage application was denied because of Rushmore's negative reporting, which she claims to know because she communicated

12

with a Rocket Mortgage employee via text messages about the basis for the denial. *Id.* at 31 (Hawthorne Dep. 206:5–17); *see also id.* at 32 (Hawthorne Dep. 207:3–5) (explaining that "the denial reason" Hawthorne received from Better Mortgage was "delinquencies on [her] credit report" which she believes must be from Rushmore's reporting "because [she did not] have other delinquencies").

The Court recognizes that this is not the strongest evidence of a connection between Rushmore's alleged FCRA violations and Hawthorne's inability to obtain credit; but it is sufficient to defeat a motion for summary judgment. A reasonable juror could credit Hawthorne's account of the import of Rushmore's negative reporting—especially if the only thing that had changed on her credit report during that period was its account of her Rushmore loan. Notably, the Court does not have a full set of credit reports from which it can determine—one way or the other—whether such an inference can be drawn. *See, e.g.*, *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1179–80 (10th Cir. 2013) (concluding that because the plaintiff's credit score had barely changed over the period in which the defendant was alleged to have violated the FCRA and he had provided no other proof that the denial of credit was due to the "negative credit reporting ruin[ing] his credit," the plaintiff had failed to establish a triable issue of material fact as to his actual damages from the alleged FCRA violation). Rushmore, however, carries the burden at this stage of the proceeding, and, on the record before it, the Court concludes that there remain material issues of fact in dispute as to Hawthorne's FCRA claim.

The Court, accordingly, denies Rushmore's motion for summary judgment as to Count V of the complaint.

B.     **Fair Debt Collections Practices Act Claim**

The FDCPA "imposes civil liability on 'debt collector[s]' for certain prohibited debt collection practices." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 576 (2010) (citation omitted). Those prohibited debt collection practices include the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Hawthorne alleges in Count VI of her complaint that Rushmore violated § 1692e in communications it made to her, after January 9, 2019, concerning the mortgage loan at issue that were misleading or false.[2] Dkt. 1-1 at 20 (Compl. ¶¶ 98–100).

Rushmore advances two arguments in support of its motion for summary judgment on Count VI. First, it argues that Hawthorne is not a "consumer" for the purposes of the FDCPA. *See* Dkt. 32-1 at 13. Second, it argues that its communications with Hawthorne were not "representations" made in connection with the collection of any debt and as such cannot violate the Act. *See id.* at 14–15. The Court is unpersuaded.

1.     *Hawthorne's status as a "consumer"*

Rushmore first asks the Court to grant summary judgment in its favor on Count VI on the ground that Hawthorne "is not a consumer under the FDCPA." *Id.* at 13. Hawthorne is not a "consumer," Rushmore argues, because "her purpose for obtaining the [l]oan was . . . commercial . . . in that [Hawthorne] rented the [p]roperty for additional income." *Id.* This argument, the Court notes, is essentially the same argument Rushmore advanced— unsuccessfully—in its motion to dismiss, Dkt. 14 at 33–34. *Compare* Dkt. 32-1 at 13–14, *with* Dkt. 7-1 at 23–24. The Court will reject that argument for substantially the same reasons.

---

[2] The parties agree that, in light of the FDCPA's one-year statute of limitations, Hawthorne's FDCPA claim concerns only those communications from Rushmore that occurred one year prior to the filing of the complaint in this action, January 9, 2019. *See* Dkt. 35-1 at 10; Dkt. 37 at 6.

Rushmore argues that the FDCPA does not apply here because the Act defines a "debt" as "any obligation . . . of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes," Dkt. 32-1 at 13 (emphasis omitted) (quoting 15 U.S.C. § 1692a(5)), and, according to Rushmore, the record shows that Hawthorne "purchased the [p]roperty as a rental unit for commercial purposes," *id.*  Rushmore is correct on the law, but not on the facts.

Portions of Rushmore's factual argument are undisputed.  The real property for which Hawthorne obtained the loan at issue is located in the District of Columbia, yet Hawthorne acknowledged during her deposition that she has lived in New Jersey since 2013.  *See* Dkt. 32-4 at 6 (Hawthorne Dep. 22:4, 13).  She also acknowledged in her interrogatory responses that she was harmed by Rushmore's alleged actions because she was unable to qualify for a loan "that she sought to use to renovate her property so that she could rent it for additional income."  Dkt. 32-5 at 5 (Interrog. 2).  But, as the Court pointed out in its August 30, 2021, opinion denying Rushmore's motion to dismiss the FDCPA claim on these grounds, these facts merely show that Hawthorne has *maintained* the loan for commercial purposes.  *See* Dkt. 14 at 33.  They do not concede—as Rushmore incorrectly posits—"that she *purchased* the [p]roperty as a rental unit for commercial purposes" or that she obtained the loan at issue for commercial purposes.  Dkt. 32-1 at 13 (emphasis added).

Other facts in the record, moreover, suggest that Hawthorne, in fact, purchased the property and incurred the debt at issue for a non-commercial purpose.  Hawthorne testified in her deposition that she lived in the property that is the subject of the loan from 2006 until 2011.  *See* Dkt. 35-4 at 2 (Hawthorne Dep. 23:16–17).  The deed of trust for the property associated with

15

the loan is dated November 30, 2007, *see* Dkt. 7-2 at 2, showing that Hawthorne took out the loan during the time she lived on the property. The deed of trust, moreover, is consistent with Hawthorne's testimony: it contains an "'occupancy' covenant, pursuant to which Plaintiff represented that she would use the property as her 'principal residence within sixty days after execution of the [deed] and shall continue to occupy the [p]roperty as [her] principal residence for at least one year after the date of occupancy.'" Dkt. 14 at 33 (quoting Dkt. 7-2 at 4).

Based on this evidence, a reasonable jury could find that, at the time Hawthorne incurred the debt, she was using the property as her residence, even if, years later, it became a rental property. Rushmore advances no argument as to why Hawthorne must maintain the loan primarily for personal purposes to qualify as a consumer under the FDCPA. The cases it cites in support of its argument discuss properties that were purchased as rental properties. *See Aniel v. TD Serv. Co.*, No. 10-05323, 2011 WL 109550, at *4 (N.D. Cal. Jan. 13, 2011) (dismissing an FDCPA claim when "the loan money was used to pay for real property"); *Fischer v. Fed. Nat'l Mortg. Ass'n*, 302 F. Supp. 3d 1327, 1331 (S.D. Fla. 2018) (dismissing an FDCPA claim because "the debt in question was obtained in connection with his business's purchase of his real estate investment property" (citation and internal quotation marks omitted)); *Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*, 638 F. App'x 100, 102 (2d Cir. 2016) ("[T]o the extent that the alleged debt, whether actually owed or mistakenly assessed, stems from telecommunications services provided by Verizon to SMZ, the claim arises out of a commercial transaction and is not covered by the FDCPA.").

The Court will not do Rushmore's homework for it and will, accordingly, deny its motion for summary judgment as to Count VI on this ground. *See also Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, LLC*, 214 F.3d 872, 874 (7th Cir. 2000) (concluding, in a case

in which the plaintiff took out a mortgage to buy a property, used the property as his personal residence for a time, but was renting the property when the alleged violation of the FDCPA occurred, that "the relevant time is when the loan is made, not when collection is attempted").

2. *"Representations" made "in connection with the collection of any debt"*

Finally, Rushmore argues that its communications with Hawthorne after January 9, 2019, were not "representation[s]" made "in connection with the collection of any debt." Dkt. 32-1 at 14–15 (emphasis omitted) (quoting 15 U.S.C. § 1692e). In determining whether a communication was made "in connection with the collection of a[] debt," 15 U.S.C. § 1692e, courts consider a number of factors including "the 'nature of the parties' relationship,' the '[objective] purpose and context of the communication[],' and whether the communication includes a demand for payment." *In re Dubois*, 834 F.3d 522, 527 (4th Cir. 2016) (alterations in original) (quoting *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385 (7th Cir. 2010)). Courts have not, however, viewed a demand for payment itself as the be-all and end-all of the inquiry. *See Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 266 (3d Cir. 2013) ("[T]he absence of a demand for payment is just one of several factors that come into play in the commonsense inquiry of whether a communication from a debt collector is made in connection with the collection of any debt." (quoting *Gburek*, 614 F.3d at 385)); *Maynard v. Cannon*, 401 F. App'x 389, 395 (10th Cir. 2010) (same). Rather, courts consider whether the communication was made "to induce" a debtor to settle her debt. *See Heintz v. Jenkins*, 514 U.S. 291, 294 (1995) (explaining that in ordinary English, an attempt to "collect a debt" is an attempt "to obtain payment or liquidation of it, either by personal solicitation or legal proceedings" (quoting Black's Law Dictionary 263 (6th ed. 1990))); *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011) ("[F]or a communication to be in connection with the collection of a

17

debt, an animating purpose of the communication must be to induce payment by the debtor." (citing *Gburek*, 614 F.3d at 385)). And courts have recognized that communications can have dual purposes and still satisfy this test. *See, e.g.*, *Daniels v. Select Portfolio Servicing, Inc.*, 34 F.4th 1260, 1267 (11th Cir. 2022) (acknowledging that "a communication can 'have dual purposes,' such as providing a consumer with information and demanding payment on a debt" (quoting *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1217 (11th Cir. 2012))).

Rushmore acknowledges that it communicated with Hawthorne on at least two occasions alleged in the complaint: in March 2019 and October 2019. But it argues that "[t]hese communications . . . provide[d] updates and explanations as to how the escrow account analysis changed" and were "standard communications between a loan servicer and its customer pertaining to the servicing of the customer's loan." Dkt. 32-1 at 15. They were not, Rushmore maintains, "intended . . . to collect a debt." *Id.*

At least one of those communications, the October 24, 2019 letter, is in the record. That letter states that "[d]ue to unforeseen circumstances, [Rushmore] made the business decision to retract [Hawthorne's] escrow analysis and return [her] loan back to its original state prior to the analysis." Dkt. 32-10 at 2. It further explains that Hawthorne's "loan will be re-analyzed on a date later to be determined and [Rushmore] will send [her] advanced notification prior to the new payment effective date." *Id.* The letter does not contain an explicit demand for payment, but it does state that if Hawthorne's escrow account had a surplus, which Hawthorne alleges hers did at that time, *see* Dkt. 1-1 at 10 (Compl. ¶ 48), "the surplus amount will not be refunded or credited against the next year's escrow payments on the loan unless the subject loan was current at the time Rushmore [] conducted the escrow account analysis," *id.* at 3.

Although not a debt collection notice in a traditional sense, the Court cannot foreclose the possibility that a reasonable jury could find that the October 2019 letter contained an inducement to settle a debt. *See Heintz*, 514 U.S. at 294. The letter also arguably injected a layer of confusion regarding Hawthorne's payment obligations, s*ee* Dkt. 35-4 at 3–4, and that newfound ambiguity was accompanied by the suggestion that any "surplus amount" held in escrow might be lost to Hawthorne if she was not "current" on her payments, Dkt. 32-10 at 3. To be sure, the letter might also be read to suggest that the surplus would be applied to arrears on the loan. But that is not the only possible reading of the letter, and the Court may not substitute its own view of the evidence for a reading of the letter that is within the purview of the jury. On that reading of the letter, it seems possible to conclude that upon receipt of the letter, Hawthorne would have been induced to settle her debt, and the letter would have constituted a "representation" made "in connection with the collection of a[] debt." 15 U.S.C. § 1692e. Moreover, that letter, by adding yet another layer of confusion as to the amount Hawthorne owed, could be viewed by a reasonable jury as "misleading" (and, at the very least, Rushmore advances no argument as to why that would not be a reasonable conclusion to draw from this record).

In addition to the October 2019 letter, the Court also notes that other documents in the record might also qualify as communications from Rushmore to Hawthorne made "in connection with the collection of a[] debt." 15 U.S.C. § 1692e. Appended to the complaint, for example, is an October 11, 2019 mortgage statement that states that "Rushmore Loan Management Services LLC is a Debt Collector, who is attempting to collect a debt" and details the amount Hawthorne purportedly owed Rushmore. *See* Dkt. 1-1 at 32. Hawthorne contends that Rushmore violated the FDCPA by sending this statement because the statement incorrectly included fees charged for landscaping services, *see* Dkt. 1-1 at 10 (Compl. ¶ 47); Dkt. 35-1 at 9, and courts have found

19

that mortgage statements like this one can be the basis of an FDCPA violation if the "representation[s]" in them are "false, deceptive, or misleading," 15 U.S.C. § 1692e; *see, e.g.*, *Daniels*, 34 F.4th at 1268 (11th Cir. 2022).

Although an admittedly close question, the Court concludes that Rushmore has failed to carry its burden of demonstrating that no reasonable jury could find that it made representations to Hawthorne in connection with the collection of a debt.

## CONCLUSION

For the foregoing reasons, Rushmore's motion for summary judgment, Dkt. 32, is hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 29, 2023